UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

Stone Cast, Inc.,                                           Chapter 11
                                                            Case No. 11-1045-1 (REL)

                              *Debtor.*
-----------------------------------------------------------x
Jeffrey M. Brown Associates, Inc.,

                              *Plaintiff,*

         v.                                                 Adv. Pro. No. 11-08337 (RDD)

Stone Cast, Inc.,

                              *Defendant.*
-----------------------------------------------------------x

APPEARANCES:

Howard Blum, P.C., by Howard Blum, Esq. and Platzer, Swergold, Karlin, Levine, Goldberg &
Jaslow, LLP, by Clifford A. Katz,. Esq. and Mitchell L. Kaplan, Esq., for Jeffrey M. Brown
Associates, Inc.

Couch Dale Marshall P.C., by Mark W. Couch, Esq., for Stone Cast, Inc.

### MEMORANDUM OF DECISION AFTER TRIAL

Hon. Robert D. Drain, United States Bankruptcy Judge

         This adversary proceeding, commenced in the Supreme Court of the State of New

York, County of New York, Index No. 602603/06, was removed to the Bankruptcy Court for the

Northern District of New York pursuant to 28 U.S.C. § 1452(a) and then, by Stipulation and

Order on Consent, dated August 3, 2011, to this Court.[1]  The parties originally asserted claims

against each other arising out of the construction of a parking garage for Fordham University.

However, before removal, the state court (Stallman, J.) granted Stone Cast Inc.'s ("Stone Cast")

motion for summary judgment on the claims of Jeffrey M. Brown Associates, Inc. ("JMB"), the

---

[1] The chapter 11 case of Stone Cast, Inc., the debtor herein, is pending in the Northern District of New York.

prime contractor,[2] and JMB has not pursued any remaining claims against Stone Cast that might have been left open by Justice Stallman's ruling.  Left to be decided after pretrial rulings by this Court, therefore, is the contract claim against JMB of Stone Cast, the subcontractor responsible for providing the exterior stone "envelope" for the garage.  This memorandum of decision is based on the evidence admitted during the one-day bench trial of that claim, including the testimony of the parties' four witnesses, as well as the parties' post-trial submissions.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding, which is related to Stone Cast's chapter 11 case, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b).  This is not a core proceeding under 28 U.S.C. § 157(b), but the parties have consented to this Court's determination of Stone Cast's claim under 28 U.S.C. § 157(c)(2); see also  Dynegy Danskammer, LLC v. Peabody COALTRADE Int'l Ltd., 905 F. Supp. 2d 526, 530 (S.D.N.Y. 2012); Executive Sounding Bd. Assocs. v. Advanced Mach. & Eng'g Co. (In re Oldco M Corp.), 484 B.R. 598, 606-08, 614 (Bankr. S.D.N.Y. 2012) (Congress has not precluded Article III, district courts' determination of any class of cases, proceedings and matters referred by the district courts to the Article I, bankruptcy courts; therefore, the bankruptcy courts' exercise of jurisdiction on consent does not implicate non-waivable, structural constitutional rights.).

## Findings of Fact and Conclusions of Law

JMB and Stone Cast entered into a Purchase Order – Materials agreement (the "Contract")[3] on March 17, 2005, pursuant to which Stone Cast agreed to provide pre-fabricated stone base walls, column covers, piers, pedestrian bridge and horizontal panels and related drawings for a Fordham University parking garage and JMB agreed to pay Stone Cast $2.2

---

[2] See Decision and Order in Jeffrey M. Brown, Assocs., Inc. v. Stone Cast, Inc., Index No. 602603/2006, dated April 22, 2008 ("Summary Judgment Ruling").
[3] Stone Cast Ex. 1, p. 1.

million for its work.  Id.  The panels and other pieces were to be delivered to JMB F.O.B. at

Stone Cast's Fort Edward, New York yard.  Id. ¶ 1.1

      The Contract scheduled eleven payments to be made to Stone Cast by JMB

between March 5, 2005 and January 5, 2006 in specific amounts based on milestones to be met

by Stone Cast before each payment.  Id., p. 1.

      The raw materials were to be delivered to Stone Cast's yard on or about August 1,

2005, and fabricated panels were to be ready for pickup by JMB's agent starting on November 1,

2005 and completed for final pickup by January 3, 2006.  Id., p. 2.  Under ¶ 7.1 of the Contract,

"Time is of the essence.  [Stone Cast] shall furnish all submittals and materials associated with

this [Contract] by the date or dates set forth herein."

      The Contract also specified that Stone Cast "warrants materials supplied

hereunder to conform to all plans, drawings, and/or specifications, to be fit for purposes

intended, merchantable, and of the highest quality and workmanship."  Id. ¶ 6.1.  After a seven-

day notice and cure period, it permits JMB to correct defects or lack of performance and relieves

JMB of its payment obligation pending satisfactory correction or if any work is rejected as non-

conforming.  Id.

      Consistent with the foregoing paragraph, as well as the Contract's time-of-the-

essence provision, the parties agreed that JMB "shall promptly advise [Stone Cast] in writing if

the Owner or [JMB] disapproves of or is withholding all or any of a Request for Payment," id. ¶

3.3, and states, "Both parties agree to endeavor to promptly resolve such disputes on an ongoing

basis."  Id.

      Contract ¶ 10.1 provides,

In the event [Stone Cast] fails to comply, or becomes unable to comply, or with
reasonable probability (as determined solely by [JMB]) will become unable to

3

> comply, with any of the provisions of this [Contract], or in the event [Stone Cast]
> fails in any respect to prosecute the work with promptness and diligence, or
> causes by any action or omission a stoppage or delay of the work of [JMB] or any
> other Supplier of [JMB] and such failure, inability or deficiency (as determined
> solely by [JMB]) is not corrected within five days after written demand by [JMB]
> to [Stone Cast], [JMB] may, in addition to and without prejudice to any other
> right or remedy, take over and complete the performance of the [Contract], at the
> expense of [Stone Cast].  [Stone Cast] shall receive no further payment on this
> [Contract] until the work has been completed and accepted by the Owner and
> payment has been received by [JMB] from the Owner.

In addition to this rather onerous (for Stone Cast) default provision, Contract ¶ 12.1 permits JMB

to terminate for convenience, without cause:

> [JMB] may, at any time, terminate this [Contract] in whole or in part via written
> notice for [JMB's] convenience and without cause.  [Stone Cast] shall recover as
> its sole remedy payment for work properly performed in connection with the
> terminated portion of the work prior to the effective date of the termination and
> for items properly and timely fabricated off the Project site, delivered and stored
> in accordance with [JMB's] instructions.  [Stone Cast] hereby waives and forfeits
> all other claims for payment and damage, including, without limitation,
> anticipated profits and restocking fees.

The Contract has a New York choice of law provision, id. ¶ 13.1,[4] as well as an

integration clause that requires, except as otherwise provided in the Contract, any amendments or

modifications to be in a written change order signed by the parties.  Id. ¶ 2.1.  The Contract also

provides, "No payment shall constitute acceptance by [JMB] of the materials for which the

payment is made; nor shall any payment constitute a waiver of any right to require fulfillment of

all the terms of this [Contract]."

Neither the Fordham project nor Stone Cast's part of it went smoothly.  Indeed,

JMB sent Stone Cast two default notices, dated October 24, 2005[5] and January 17, 2006,[6] which

were based on Stone Cast's asserted failure to comply with the Contract's original schedule and

---

[4] The parties have correctly assumed that New York law governs this dispute involving a contract made and to be performed in New York.
[5] JMB Ex. 6.
[6] JMB Ex. 9.

a modified timetable agreed by the parties.  The parties never entered into a change order altering the Contract's schedule or a formal written waiver of the foregoing defaults, although, as discussed below, consistent with Contract ¶ 3.3, they subsequently agreed on a new method for payment upon verification of ongoing work.

Ultimately, JMB did not exercise its default rights, including under Contract ¶ 10.1.  Instead, by letter dated April 24, 2006,[7] JMB terminated for convenience under Contract ¶ 12.1.  As determined by Justice Stallman, that choice precluded JMB from asserting a claim against Stone Cast for breach of the Contract and failure to cure under ¶ 10.1.  Summary Judgment Ruling at 2, citing Tishman Constr. Corp. v. City of New York, 228 A.D.2d 292 (1st Dept. 1996), and Paragon Restoration Grp.. v. Cambridge Sq. Condominiums, 42 A.D.3d 905 (4th Dept. 2007), for the proposition that JMB's termination for convenience deprived Stone Cast of its right to cure its alleged failures to perform and therefore precluded JMB's breach claim.

JMB's April 24, 2006 termination letter stated that JMB "has arranged for the immediate removal and transportation of the stockpiled materials that have been previously requisitioned and paid for by Fordham University which includes but is not necessarily limited to the Champlain granite, steel molds/forms and epoxy coated rebar," Joint Ex. 16, which, in a letter dated May 3, 2014,[8] JMB again demanded be readied for pickup.  Although JMB's complaint did not assert a claim for the return of contract-related materials in Stone Cast's possession, the Summary Judgment Ruling left open JMB's right to amend the complaint to seek such relief, which is within the contemplation of Contract ¶ 12.1, but JMB has not done so.  Nor did JMB thereafter seek recovery of any materials from Stone Cast.

---

[7] Stone Cast Ex. 16.
[8] JMB Ex. 19.

Thus, the remaining claim in this case (this Court having previously granted JMB's motion to dismiss Stone Cast's quantum meruit and unjust enrichment claims in light of Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y..2d 382, 386 (1987), and MCK Bldg. Assocs., Inc. v. St. Lawrence Univ., 301 A.D.2d, 726, 728 (3d Dept. 2003) (existence of enforceable contract precludes quantum meruit and unjust enrichment claims unless contract was wrongfully terminated prior to completion, thus thwarting performance)),[9] is Stone Cast's claim that JMB breached Contract ¶ 12.1 by failing to pay Stone Cast the amount required after termination for convenience.  The parties' other Contract rights and remedies do not apply except as they might inform the operation of Contract ¶ 12.1.

Stone Cast's claim comprises the following four elements:  (1) $176,050 of retainage withheld by JMB in respect of Stone Cast's first seven bills, which were otherwise paid by JMB, exclusive of completed panels or units; (2) $207,000 for 46 panels not paid for in Stone Cast's eighth bill,[10] at a rate, however, of $4,500 per panel instead of the billed amount of $121,411.20; (3) $124,750 demanded by Stone Cast in a letter dated May 2, 2006[11] for work that Stone Cast allegedly performed before the April 24, 2006 termination letter and after the submission of Stone Cast's eighth bill; and (4) storage costs, at a rate of $5,000 per month, and aggregating $465,000 as of February 14, 2014, for panels and other materials demanded by JMB in its April 26, 2006 and May 3, 2006 letters to be readied  for pickup by JMB.[12]

JMB opposes this relief on three grounds.  First, JMB has contended, albeit only at oral argument and in its post-trial submission, that Stone Cast has not carried its burden to

---

[9] December 10, 2013 Trial Transcript ("Tr.") at 5-6.  See also Lockhead Martin Transp. Sec. Solutions v. MTA Capital Constr. Co., 2014 U.S. Dist. LEXIS 131395, *100 (S.D.N.Y. Sept. 15, 2014)

[10] Stone Cast Ex. 15.

[11] Stone Cast Ex. 17.

[12] Post-Trial Submission of Stone Cast, Inc., Debtor/Defendant, dated February 14, 2014 ("Stone Cast's Post-Trial Submission), p. 17-18.

establish its claimed damages in any respect.  Second, it asserts that Stone Cast's work product

was defective and therefore not compensable under Contract ¶ 12.1, which requires payment

only for work "properly performed."  Last, JMB asserts that to the extent Stone Cast is claiming

payment for specific items, such items were not "timely fabricated" for purposes of Contract ¶

12.1.

      As noted, Stone Cast's claim is premised on JMB's alleged breach of Contract ¶

12.1, that is, on JMB's alleged failure to pay "for work properly performed in connection with

the terminated portion of the work prior to the effective date of termination and for items

properly and timely fabricated off the Project site, delivered and stored in accordance with

[JMB's] instructions."[13] This is Stone Cast's "sole remedy for payment," under ¶ 12.1, as Stone

Cast "waives and forfeits all other claims for payment and damage, including, without limitation,

anticipated profits and restocking fees."  Id.

      Contract ¶ 12.1 is clear on its face and thus must be enforced according to its terms

as expressing the parties' intentions.  J. D'Addario & Co. v. Embassy Indus., Inc., 20 N.Y.3d

113, 118 (2012); Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002).  This

requirement is especially apt here because the Contract was terminated as of right under a

termination-for-convenience clause, and, therefore, such termination did not constitute a breach,

the only amount owing being that specified by the parties in ¶ 12.1 in the event of such a

bargained-for termination. See A.J. Temple Marble & Tile v. Long Island R.R., 256 A.D.2d 526,

527 (2d Dep't 1998) (where contract was terminated under termination-for-convenience

provision, damages are limited to those unpaid amounts owing under such provision, as

termination as of right is not a breach giving rise to other claims); see also Paragon Restoration

Grp., Inc. v. Cambridge Sq. Condominiums, 42 A.D.3d at 906 (plaintiff's damages limited to

---

[13] Contract ¶ 12.1.

unpaid amounts provided for in termination-for-convenience clause); <u>Crow & Sutton Assoc., Inc.</u>
<u>v. Welliver Mcguire, Inc.</u>, 32 A.D.3d 651, 651-52 (3d Dept. 2006) (court enforces plain meaning
of termination-for-convenience payment provision).

  Of the elements of a contract claim under New York law (the existence of a
contract, the plaintiff's performance under the contract, the defendant's breach of that contract,
and resulting damages, <u>Resetarits Constr. Corp. v. Olmsted</u>, 118 A.D.3d 1454 (4th Dept. 2014)),
only the amount owed and unpaid under Contract ¶ 12.1 and the proper performance and
timeliness of Stone Cast's work are at issue.  On these issues, Stone Cast has the burden of proof
by a preponderance of the evidence. <u>Metropolitan Switch Bd. Mfg. Co., Inc. v. B & G Elec.</u>
<u>Contrs., Div. of B & G Indus., Inc.</u>, 96 A.D.3d 725, 726 (2d Dept. 2012); <u>Paragon Restoration</u>
<u>Grp. v. Cambridge Sq. Condominiums</u>, 42 A.D.3d at 906.  That burden can shift, however, as
"[u]nder New York law, evidence of a signed written agreement between the parties, along with
invoices reflecting the defendant's unpaid balance, is sufficient to establish a prima facie case for
breach of contract.  The burden then shifts to the defendant to provide competent evidence
raising a question of material fact." <u>AT&T Corp. v. Publ'g Concepts L.P.</u>, 2010 U.S. Dist.
LEXIS 32871, *8 (S.D.N.Y. Mar. 29, 2010) (internal citations omitted); <u>see</u> <u>also</u> <u>Paragon</u>
<u>Restoration Grp. v. Cambridge Sq. Condominiums</u>, 42 A.D.3d at 906.

  Applying the foregoing principles to the facts, it is clear that Stone Cast has not
sustained certain elements of its claim but has proven others.

  First, Stone Cast has no right under Contract ¶ 12.1 -- which, as discussed above,
contains Stone Cast's "sole remedy for payment" and under which Stone Cast "forfeits all other
claims for payment and damage" if the Contract is terminated for convenience -- to any storage
costs.  Storage costs are not mentioned in ¶ 12.1, nor, under the clear language of that paragraph,

does JMB have any duty to remove materials from Stone Cast's yard upon termination for convenience; it simply has the right to do so, which it has declined to enforce.

Nonetheless, citing <u>RSG Caulkng & Waterproofing. V. J.P. Morgan Chase & Co.</u>, 13 Misc. 3d 1218(A) (Sup. Ct. 2006), or based on an estoppel theory, for which no support is cited, Stone Cast argues that JMB must pay such costs based on JMB's alleged "bad faith or other transgression" in not following through on its April 24, 2006 and May 3, 2006 letter demands that Stone Cast stand ready for JMB's pickup and removal of stockpiled materials. Stone Cast's Pre-Trial Submission, p. 16-17.[14]

<u>RSG Caulking</u> is readily distinguishable, however. Not only was that decision issued in the context of a challenge to an arbitration ruling, where judicial review is highly deferential, <u>id.</u>, *12-17, but also, in contrast to Contract ¶ 12.1, the termination-for-convenience provision in <u>RSG Caulking</u> did not limit claims, the provision could be read to permit the asserted claims, and/or the arbitrators could have concluded that the contract was not properly terminated for convenience. <u>Id.</u>, *19-23.

Moreover, Stone Cast has failed to establish that JMB caused it unconscionable injury by failing to pick up material after having written twice in the spring of 2006 that it intended to do so, or that Stone Cast reasonably relied on those letters, each necessary elements of an estoppel claim. <u>Ferreyr v. Soros</u>, 116 A.D.3d 407, 407-08 (1st Dept. 2014). Indeed, Stone Cast has failed to establish that it was damaged in any way by keeping the material on its lot, let alone that it was damaged in the amount of $5,000 a month (no provision in the Contract

---

[14] Stone Cast also contends that JMB is "judicially estopped" from denying responsibility for storage charges "by the commencement of the state court action to recover the materials." However, JMB's complaint in this proceeding did not seek such relief, and, in addition, there has been no court ruling in reliance upon any such claim by JMB, a condition of a viable judicial estoppel claim. "The offense is not taking inconsistent positions so much as it is winning twice on the basis of incompatible positions." <u>Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.</u>, 840 F. Supp. 211, 219 (E.D.N.Y. 1994). <u>See generally</u> <u>Bates v. Long Island R. Co.</u>, 997 F.2d 1028, 1038 (2d Cir. 1992), <u>cert. denied</u>, 510 U.S. 992 (1993).

provides for or quantifies storage costs). In addition, with the exception of JMB's April 24, 2006 and May 3, 2006 letters, there is no evidence that JMB pressed its request for Stone Cast to stand ready to permit the materials to be removed. Nor has Stone Cast introduced any evidence to show that it reasonably relied after May 2006 on the notion that JMB wanted it to incur substantial storage costs pending JMB's retrieval of the materials, with the exception of JMB's failure to object to the $5,000 monthly storage cost charges that appeared (apparently for the first time, as no earlier bills with such charges were introduced) in Stone Cast's September 30, 2009 and March 31, 2010 bills,[15] sent to JMB years after the Contract was terminated. The record thus does not establish that JMB reasonably led Stone Cast to believe that it should incur any material storage costs, let alone such costs in excess of $465,000 over several years after the autumn, 2006 completion of the Fordham garage.[16]

Stone Cast's claim to be paid $4,500 per completed panel for 46 panels not previously paid for in its eighth bill also fails, because the parties never agreed to this payment measure under the Contract. Although the evidence shows that on March 8, 2006 JMB proposed an interim payment modification of this nature to Fordham[17] and representatives of JMB and Fordham testified that they agreed to it between themselves,[18] there is no evidence that the modification was ever implemented with Stone Cast, or that Stone Cast was even aware of it, let alone that it was agreed in a signed writing under Contract ¶ 2.1. Stone Cast's seventh bill does not employ the $4,500 per panel methodology. [19] Nor does the March 20, 2006 recommendation

---

[15] Stone Cast Exs. 19 and 20, respectively.

[16] Tr. at 249 (testimony of Dr. Brian Byrne of Fordham University). After JMB hired a replacement subcontractor for Stone Cast, the parking garage was completed in time for the 2006 Fall Term. Id.

[17] See JMB Ex. 16, consisting of a letter by JMB's project manager, Michael McAleer to Fordham's Dr. Brian Byrne proposing a possible, fall back accelerated payment mechanism on a $4,500 per panel basis.

[18] Tr. at 205-06 (testimony of JMB's Michael McAleer); Tr. at 240-41 and 250 (testimony of Fordham's Dr. Brian Byrne).

[19] Stone Cast Ex. 13.

for payment to Stone Cast made by Douglas Hyde to Fordham and JMB's representatives after they sent him to Stone Cast's yard to check on the status of the work.[20]  Instead, Mr. Hyde recommended payment of previously withheld amounts from prior bills that employ the Contract's payment methodology[21] (which appears to be what JBM did in its March 31, 2014 check).[22] Stone Cast's last, unpaid bill also does not employ the $4,500 "per panel" formula, although that would have been more lucrative for Stone Cast, but, rather, uses the Contract payment formula.[23]

Moreover, even if JMB had agreed with Stone Cast to modify payment terms along the lines of a $4,500 per panel formula, the only description of that methodology, set forth in JMB's March 8, 2006 proposal to Fordham, contemplated just an interim acceleration, not a permanent change to the overall Contract price.[24]  Stone Cast's "$4,500 per panel" contention, therefore, is an unwarranted attempt to inflate Stone Cast's claim under Contract ¶ 12.1 above the price for Stone Cast's work set forth on page 1 of the Contract.  If Stone Cast is to be paid anything for the work covered by its unpaid eighth bill, in should be at the Contract rate reflected by that bill's $121,411.20 demand plus the $30,000 retainage included in the bill.

JMB's remaining challenge to the amount of Stone Cast's claim, however, is unavailing.  JMG argues that, having paid the first seven of Stone Cast's bills, exclusive of retainage, JMB also advanced $124,000 by check dated March 30, 2006 for work that was not actually billed by Stone Cast until its eighth bill.[25]  JMB supports this contention by noting that

---

[20] Stone Cast Ex. 14,
[21] Id.
[22] Stone Cast Ex. 13.
[23] Stone Cast Ex. 15, consisting of Stone Cast's eighth bill, for March 2006.  See also Stone Cast Ex. 17, which is Stone Cast's post-termination May 2, 2006 demand letter, which also does not use the $4,500 per panel measure and is, instead, consistent with the pricing provisions on page 1 of the Contract and the pricing measure used in Stone Cast's prior bills.
[24] JMB Ex. 16.
[25] Post-Trial Brief of Jeffrey M. Brown Associates, Inc., dated February 13, 2014, p. 2, 4-5.

Douglas Hyde's March 20, 2014 email to Fordham and JMB's representatives[26] recommended releasing $20,000 for molds and steel and $104,000 for the completion of 39 panels whose completion he had verified, which coincides with the amount of JMB's March 30, 2014 check. JMB contends, therefore, that it has already paid $124,000 of the amount claimed by Stone Cast.

Upon review of the first seven bills, however, JMB's math does not add up.  Having examined these bills[27] and the evidence of payments therefor,[28] it is clear that the $124,000 was applied by Stone Cast to satisfy bills prior to the unpaid, eighth bill, which was in the amount of $121,411.20 plus $30,000 of retainage and references "materials presently stored not included in work previously completed" of $151,764.[29]  Therefore, Stone Cast was not double counting in its eighth bill or in its final demand on May 2, 2014 for work not covered by the eighth bill but completed before the termination date of April 24, 2006.  The seventh bill does not list any completed panels, and the three checks paid on it therefore are not for completed panels but, rather, for the items listed on that bill.[30]  The March 30, 2006 check clearly is not an overpayment of the seventh bill.  Douglas Hyde's March 20, 2006 email[31] is more properly read as verifying that Stone Cast was successfully continuing its work, thereby warranting that JMB should feel comfortable paying its prior bills, rather than advocating advance payments for bills yet to be issued.  This would be consistent with Douglas Hyde's testimony regarding his instructions to confirm the ongoing progress of Stone Cast's work before JMB would pay its bills.  See Tr. at 101-02, 123-24.

---

[26] Stone Cast Ex. 14.
[27] Stone Cast Exs. 2, 5, 7, 9, 11, 12, 13.
[28] Stone Cast Exs. 4, 5, 7. 9, 11, 12, 13.
[29] Stone Cast Ex. 15.
[30] Stone Cast Ex. 13.
[31] Stone Cast Ex. 14.

Although JMB has not pointed to any other evidence that Stone Cast's bills were inaccurate, it asserts that Stone Cast has not proven by a preponderance of the evidence that they are accurate, for example questioning why Stone Cast has not introduced any photographs of the completed work covered by its eighth bill or by its May 2, 2006 demand letter.  However, under AT&T Corp. v. Publ'g Concepts L.P., 2010 U.S. Dist. LEXIS, *8, and the cases cited therein, Stone Cast's bills shifted the burden to JMB to provide evidence to challenge the bills, which it has not done.[32]

Moreover, Stone Cast did provide additional evidence, in the form of testimony by its representative, Terry Karanikas, as well as by Mr. Hyde, that the work covered by the eighth bill and the May 2, 2006 demand letter was actually performed and billed as provided in the Contract.[33]  The Court found both Mr. Karanikas and Mr. Hyde credible witnesses, Mr. Hyde being a truly a neutral third party with no real stake in this dispute.  Moreover, although the Court did not grant Stone Cast's motion to sanction JMB for its failure to comply with discovery requests, it is clear that it was the practice of Michael McAleer, JMB's primary representative on the project, to take notes, subsequently recorded in digital form, on his site visits, which he testified would have reflected whether Stone Cast had in fact done the work that it billed for,[34] and JMB has not produced any such notes.[35]  Mr. McAleer further testified that he believed it was especially important to prepare site visit notes if a problem with the subcontractor had been

---

[32] Justice Stallman's denial of Stone Cast's summary judgment motion is not to the contrary.

[33] See Affidavit of Terry Karanikas, dated December 3, 2013, comprising Mr. Karanikas' direct testimony as provided for in the Court's pretrial procedures, at ¶¶ 11, 24-5, 29-30;  Tr. at 101-02, 111, 123-25 (testimony of Douglas Hyde).  Fordham project meeting minutes, admitted as JMB Exs. 14 (meeting of January 21, 2006) and 17 (meeting of April 19, 2006), do not change the Court's finding.  The minutes reflect meetings that were not attended by any representative of Stone Cast and reflect only JMB's representative's assessment of Stone Cast's performance.  The January 2006 meeting minutes' observation, at page 7, regarding the number of panels completed is superseded by Mr. Hyde's later reports, and the April 2006 meeting minutes' observation, at page 4, on the delivery status of the panels does not note any specific number of incomplete or unprepared panels.

[34] Tr. at 148-49, 155, 161

[35] Tr. at 161.

identified,[36] and that he actually counted Stone Cast's finished panels on his site visits.[37]  The

Court infers, therefore, that JMB would have provided evidence of Stone Cast's failure to

complete the work for which it billed JMB if such work had, in fact, not been completed.  JMB

could offer no credible reason for not producing its representatives' contemporaneous notes of

site visits, including one in the third week of April 2006 that concededly occurred when the

completion of work covered by Stone Cast's eighth bill and most of Stone Cast's May 6, 2006

letter could have been verified, except that there were no such notes detailing problems with the

number of panels produced.

Accordingly, Stone Cast has carried its burden that the amount of its bills,

comprising (a) $176,050 of retainage under its first seven bills, (b) $121,411.20 demanded by its

eighth bill as well as $30,000 of unpaid retainage in that bill, and (c) $124,750 listed in its May

2, 2006 demand letter for work done between the work covered by the eighth bill and the April

24, 2014 termination letter, totaling $452,211.20, is correct.

JMB's remaining objections to Stone Cast's claims are more substantial, but they

also fail upon review of the evidence, including the Court's assessment of the witnesses'

credibility.  As noted above, under Contract ¶ 12.1 after termination for convenience Stone Cast

is entitled to be paid only for "work properly performed in connection with the terminated

portion of the work prior to the effective date of termination and for items properly and timely

fabricated off the Project site, delivered and stored in accordance with the Contractors

instructions." (Emphasis added.)  JMB contends that the work for which Stone Cast has billed it

was not properly performed and the items covered by its bills were not properly and timely

fabricated.

---

[36] Id.
[37] Tr. at 163.

On the issue of whether Stone Cast properly fabricated the items for which it billed JMB, JMB relies almost exclusively on the testimony of Mr. McAleer. However, Mr. McAleer, who generally was not credible, was especially not credible on this issue. Mr. McAleer's affidavit, dated December 2, 2013 ("McAleer Aff."), which under the Court's pre-trial procedures constituted his direct testimony, makes the following serious and sweeping allegations:

> I personally observed that the performance of Stone Cast was very poor, both from a quality and time perspective. I had repeated discussions with Fordham's construction representatives, Dr. Brian Byrne (Vice President for Construction) and Mr. Tony Aloi (Director of Construction), about Stone Cast's improper performance. . . . [I]t was very disturbing to both Fordham and JMB that there were significant issues of safety. Stone Cast was putting the Fordham community and the public at serious safety risk by its improper and faulty performance. The manufactured panels that I observed had loose granite stones which could fall and injure individuals. I personally observed this fact during my site visits to Stone Cast's manufacturing facility. I discussed this a number of times with Stone Cast's president, Terry Karanikas.

McAleer Aff. ¶ 10. Mr. McAleer further testified,

> I personally visited the Stone Cast Facility on at least two (2) occasions. I observed the lack of production. I also observed the poor quality of manufacture, resulting in life safety issues. Specifically, at the first visit, when looking at the panels, I did not feel comfortable with how the granite stones were affixed to the panels. I performed a 'hammer' test, which simply involved using a 2 or 3 pound hammer to hit the granite. Unfortunately, the stones came loose. I did this a number of times, with the same result. At the second visit, I did not perform any tests because Stone Cast had not made any improvements or alterations to the granite.
>
> I also observed Stone Cast's employees using an acid wash-down on the stones. This was having a negative impact on the stones adhering to the panels.

Id. ¶¶ 26-27.

The problem with this testimony, however, is that the rest of the record, including Mr. McAleer's testimony on cross and re-direct, almost entirely belies it. First, there is no corroborating testimony or document from any Fordham representative -- or any JMB

representative, for that matter -- that the parties were disturbed that "Stone Cast was putting the Fordham community and the public at serious safety risk." The monthly project minutes of meetings between JMB and Fordham do not reflect any such discussion. There is only an April 19, 2006 minute -- only five days before JMB terminated the Contract for convenience but months after the first site visit to Stone Cast's facility at which Mr. McAleer testified in his Affidavit that he "observed poor quality of manufacture, resulting in life safety issues" – in which JMB reported that "JMB's site visit has revealed that many panels need repairs the, [sic] work that has been performed is of poor workmanship."[38] (As noted above, Stone Cast never attended these project meetings.) Mr. McAleer testified that he was the author if this minute. Tr. at 215.

Nor is there any evidence of any written communication between JMB or Fordham, on the one hand, and Stone Cast, on the other, regarding alleged safety issues or the quality of Stone Cast's work, although Mr. McAleer testified that if a site visit had identified such issues, letters probably would have been sent to Stone Cast, Tr. at 160, which stands to reason and is consistent with Contract ¶ 3.03.[39]

Moreover, as noted above, JMB has not produced any reports of Mr. McAleer's site visits to Stone Cast's facility, although Mr. McAleer testified that such reports were contemporaneously prepared and thereafter recorded in digital form and that he would have noted in them that he had performed a "hammer test." Tr. at 148-49, 151-55, 160-63, 229. Indeed, although Mr. McAleer previously testified that he performed this test during his first site

---

[38] JMB Ex. 17, p.4.
[39] Tr. at 201-02, 205, 207, and 212 in which Mr. McAleer testified that he could not recall any notices to Stone Cast regarding the quality of its work or the its failure to comply with specifications for its work from the time of his first site visit through the date of the termination letter, which followed his second, April site visit.

visit, on January 6, 2006, id. at 162, 229-31; McAleer Aff. ¶ 26, on cross examination he stated

that he instead did so during his second site visit, in April 2006.  Tr. at 216-17.

It is of course possible that memory may mislead as to when an event occurred,

but Mr. McAleer had no reasonable explanation why at trial he could remember an April site

visit and hammer test in great detail when he had twice previously testified that the event

occurred in January during a very different stage in the Contract's performance (for example,

after the January 6, 2006 site visit, JMB and Fordham delegated Mr. Hyde to report to them after

visiting Stone Cast's jobsite, at which time no quality problems were noted, and after which JMB

and Fordham paid Stone Cast hundreds of thousands of dollars, something they would not likely

have done if they had serious safety concerns about Stone Cast's work).  It is also highly unlikely

that such a dramatic event as Mr. McAleer banging away with a hammer on various panels

during a visit to Stone Cast's site would go unremarked by the other parties present. Yet this is

the case.  Neither Mr. Karanikas nor Mr. Hyde recalled such an event, nor did Mr. Hyde recall

that Mr. Basile, Fordham's structural engineer who also was on the second site visit, expressed

any material reservations regarding Stone Cast's product.[40]  Although Mr. Hyde testified that he

may not have been with Mr. McAleer or Mr. Basile during the entire April 2006 visit, id. at 127,

130-31, it simply is not credible that the results of Mr. McAleer's "hammer test" were not aired

before the visit ended.  Instead, Mr. Hyde recalled only Mr. McAleer's observing "that there

were some pockmarks or bubble marks in the back of the concrete," id. at 127, and that any

quality issues raised were a matter of "fine tuning."  Id. at 128.

It is worth noting in this regard that the record is clear that Mr. McAleer could be

outspoken, even insulting when dealing with Stone Cast; about other matters he did not hesitate

---

[40] Tr. at 63-4,66-7, and 71-2 (testimony of Terry Karanikas regarding the January 6, 2006 site visit, the lack of complaints regarding quality of the product thereafter, and the April, 2006 site visit and lack of complaints, respectively); 127-28 (testimony of Douglas Hyde regarding April 2006 site visit).

to castigate Stone Cast directly and to Fordham's representatives behind Stone Cast's back.  See, e.g., JMB Exs. 5 (October 5, 2005 email from Mr. McAleer to Fordham's Messrs. Aloi and Basile), and 13 (January 18, 2006 email from Mr. McAleer to Stone Cast, copied to Messrs. Aloi and Basile, as well as Scott Adams, an engineer on the project).  The lack of corroboration of Mr. McAleer's allegations about the quality of Stone Cast's product, therefore, cannot be attributed to his being a shrinking violet.

Finally, Mr. McAleer was particularly far-fetched when he testified, notwithstanding JMB's April 24, 2006 and May 3, 2006 demand letters,[41] that JMB did not want Stone Cast's product to be made ready for pick-up because "[w]e felt they were unsafe."  Tr. at 227-28.

Thus, credible evidence is lacking that Stone Cast failed Contract ¶ 12.1's condition that its work be properly performed and the items which it completed before termination and for which it seeks payment have been properly fabricated.

Whether such items were timely fabricated for purposes of Contract ¶ 12.1 is a closer question.  It is not a question, however, of whether all of Stone Cast's unpaid bills can be disregarded because Stone Cast missed milestones under the Contract:  as Justice Stallman's Summary Judgment Ruling precluded, that would instead be a basis for a breach claim by JMB if JMB had not terminated the Contract for convenience.  Instead, for purposes of ¶ 12.1, which puts no specific parameters around the condition that the billed-for items be "timely . . . performed," the Court may consider the parties' actual performance and expectations as adjusted by mutual consent during the course of performance.  Crow & Sutton Assoc., Inc. v. Welliver

---

[41] JMB Exs. 18 and 19, in which Mr. McAleer and JMB's outside counsel, respectively, informed Stone Cast that JMB "had made arrangements for the immediate removal and transportation of the paid for materials which were stored at your facility."

Mcguire, Inc., 32 A.D.3d at 652 (court applies termination-for-convenience remedy by its plain terms); A.J. Temple Marble & Tile v. Long Island R.R., 256 A.D.2d at 527 (same).

In any event, a "time of the essence" provision (which appeared in the Contract outside of ¶ 12.1) may be waived "where the parties, by their conduct, evince an intent that time not be of the essence." Parker Hannifin Corp. v. North Sound Props., 2013 U.S. Dist. LEXIS 67026, *20-21 (S.D.N.Y. May 8, 2013) (internal quotations omitted), which may include accepting performance after expiration of the time limit, as Contract ¶ 3.3 contemplated. Allen v. Kowaleksi, 239 A.D.2d 879 (4th Dept. 1997), app. denied, 909 N.Y.2d 806 (1997); Franklin Pavkov Constr. Co. v. Ultra Roof, Inc., 51 F. Supp. 2d 204, 207 (N.D.N.Y. 1999); see also Lockhead Martin Transp. Sec. Solutions v. MTA Capital Constr. Co., 2014 U.S. Dist. LEXIS 131395, *71 (S.D.N.Y. Sept. 16, 2014); GDJS Corp. v. 917 Props., Inc., 99 A.D.2d 998 (1st Dept. 1984), app. dismissed, 62 N.Y.2d 942 (1984). Such a "waiver may be express or implied, the intent to waive must be clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the person claiming the waiver of the right." 200 E. 87th St. Assoc. v. MTS, Inc., 793 F. Supp. 1237, 1251 (S.D.N.Y. 1992), aff'd 978 F.2d 706 (2d Cir. 1992) (internal quotations and citation omitted). "Once such a waiver has occurred, the time-is-of-the-essence provision of the contract may not be unilaterally reinstated: it is improper for a party who has waived its right to timely performance to attempt suddenly to cancel the contract without first notifying its counterparty that time is of the essence and re-setting the time for performance within a reasonable time by clear, distinct, and unequivocal notice." Lockhead Martin Transp. Sec. Solutions v. MTA Capital Constr. Co., 2014 U.S.Dist LEXIS 131395, *71-72.

Based on the trial record, I find and conclude that, for purposes of Contract ¶ 12.1, JMB repeatedly extended JMB's performance deadlines and when JMB terminated the Contract for convenience, while the projected completion of Stone Cast's work left little room for further delay, it was still on time for completing its work by JMB's "real" deadline for completion, the commencement of Fordham's Fall Term.  Tr. at 249 (testimony of Dr. Brian Byrne regarding completion of the project).

As noted above, there clearly were delays in Stone Cast's work.  The parties disagree about their cause, but I accept Mr. Karanikas' testimony, which was in part corroborated by Mr. Hyde, that much of the delay was attributable to third party failures, including the late delivery of others' drawings upon which Stone Cast's work depended, payment delays based on misinformation about the delivery of granite, and delay to the whole garage project caused by unanticipated remediation work at the garage site.  Tr. at 28-30, 40-41, 74-76 (testimony of Terry Karanikas); 103-04, 116, 119-21 (testimony of Douglas Hyde).

JMB extended Stone Cast's performance deadlines at least two times, on November 21, 2005[42] and after a visit to Stone Cast's site in the third week of January 2006[43] (which followed JMB's last formal default notice, dated January 9, 2006).[44]  The witnesses testified that starting in January and continuing through March, 2006, JMB and Stone Cast agreed to a procedure whereby JMB would pay Stone Cast only after Mr. Hyde would periodically visit Stone Cast's worksite to verify its ongoing completion of panels.  Mr. Karanikas and Mr. Hyde each testified, again credibly, that during this period JMB's payments

---

[42] JMB Ex. 7.

[43] JMB Ex. 14, p. 7 (minutes of JMB/Fordham January 25, 2006 project update meeting referencing a revised Stone Cast schedul.

[44] JMB Ex. 9.

to Stone Cast resumed based on Mr. Hyde's confirmation of Stone Cast's continuing and apparently timely work.[45] The payment history supports their testimony.[46]

Mr. McAleer disputed that Stone Cast's performance was timely after the January, 2006 extension, but, again, his testimony is not supported by the record. He made no count of completed panels on his site visits and, as noted, neither he nor JMB produced any site visit notes or reports that would show a production delay. Instead, as with the quality issue, he points only to his own statements memorialized in the April 19, 2014 JMB/Fordham project meeting minutes of a meeting that Stone Cast did not attend and that apparently were not shared with Stone Cast before the April 24, 2006 termination for convenience.[47]

JMB has also introduced a March 3, 2006 email from Mr. McAleer to, Scott Adams, the engineer on the Fordham project, as well as to Stone Cast, in which he sates, referring to the need to complete four specific panels, "Stone Cast has already screwed up the schedule as it is. If this issue is not settled and these panels are not made in the next 2 weeks the schedule is going to be screwed up even more. . . . LET'S GET IT TOGETHER PEOPLE." [48] Four points are worth noting about this email, however. First, the "issue" referred to in the email appears to be a delay in preparing engineer's drawings for the panels, not Stone Cast's work; second, JBM has not introduced any evidence that Stone Cast failed to complete these four panels; third, as discussed above, JMB sent another payment to Stone Cast after Mr. Hyde's site visit later in March; and, fourth, the email itself states, albeit hyperbolically, "There is no more fluff to take out of the schedule to save Stone Cast's ass." Id. Thus, as of the date of the email,

---

[45] Tr. at 76-85 (testimony of Terry Karanikas), 122-25 (testimony of Douglas Hyde).

[46] Stone Cast Exs. 12-14; see also Ex. B to Affidavit of Douglas Hyde, dated November 12, 2013 (consisting of March 20, 2014 email to Fordham representatives regarding Stone Cast's ongoing performance and recommending release of additional payments to Stone Cast, which were, in fact, made).

[47] JMB Ex. 17, p. 4.

[48] JMB Ex. 15.

Stone Cast appears to have been on a schedule that, although tight, by the email's own terms would serve JMB's purposes, and there is no evidence, with the exception of Mr. McAleer's own statements (notwithstanding that representatives of Fordham also participated in the April, 2006 site visit), to contradict Mr. Hyde's and Mr. Karanikas' testimony that Stone Cast was on schedule in March and April, 2006.

Accordingly, weighing all the evidence, including the credibility of the witnesses, I find and conclude that, to the extent Stone Cast has charged JMB for items completed before termination of the Contract, those items were "timely fabricated" as required by Contract ¶ 12.1.

### Conclusion

For the foregoing reasons, Stone Cast shall have judgment against JMB in the aggregate amount of $452,211.20, plus post-judgment interest at the federal rate now in effect. Counsel for Stone Cast should email chambers a proposed judgment consistent with this Memorandum of Decision.

Dated:  White Plains, New York
        November 17, 2014

                            /s/ Robert D. Drain_____
                            United States Bankruptcy Judge